OSCN Found Document:RAMEY v. SUTTON

 
 
 

 
 
 
 
 
 
 
 

 


 
 
 
 
 
 


 
 OSCN navigation


 
 
 Home

 
 Courts

 
 
 Court Dockets
 

 
 Legal Research

 
 Calendar

 
 Help
 
 





 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only
 
 
 
 
 

 
 
 
 RAMEY v. SUTTON
2015 OK 79
Case Number: 113778
Decided: 11/17/2015
IN THE SUPREME COURT OF THE STATE OF OKLAHOMA
Cite as: 2015 OK 79, __ P.3d __

 
NOTICE: THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL. 

 

 

CHARLENE RAMEY, Plaintiff/Appellant,
v.
KIMBERLY SUTTON, Defendant/Appellee.

ON APPEAL FROM THE DISTRICT COURT OF OKLAHOMA COUNTY,
THE HONORABLE JUDGE HOWARD HARALSON, PRESIDING

¶0 Same sex couple planned to have a child and co-parent. Upon the termination of their relationship and following almost ten years of co-parenting, the biological mother denied plaintiff's status as a parent and sought to end all interaction between plaintiff and child. Couple did not have a written agreement regarding parenting. Plaintiff petitioned the District Court in Oklahoma County seeking a determination of parental rights and custody. The District Court granted defendant's motion to dismiss. Plaintiff appealed and this Court issued an Order granting plaintiff's motion to retain this appeal.

DISTRICT COURT'S JUDGMENT REVERSED;
REMANDED WITH INSTRUCTIONS

Brady R. Henderson, ACLU of Oklahoma Foundation, Oklahoma City, Oklahoma, for Appellant
Rhonda G. Telford Naidu, The Law Office of Rhonda Telford Naidu, Oklahoma City, Oklahoma, for Appellant
Kacey L. Huckabee, Oklahoma City, Oklahoma, for Appellee

OPINION

WATT, J.

¶1 The issue before this Court is whether the district court erred in granting the defendant's motion to dismiss for lack of jurisdiction finding the plaintiff/Ramey lacked standing as a non-biological parent seeking custody and visitation. Questions raised are (1) whether the district court erred finding that a non-biological parent lacked standing because the same sex couple had not married and had no written parenting agreement; (2) whether a biological mother has the right as a parent to legally erase an almost ten year parental relationship that she voluntarily created and fostered with her same sex partner . We answer the first question in the affirmative and the second question in the negative. Accordingly, we reverse the decision of the district court and remand for further proceedings.

¶2 This is a matter of first impression before this Court. In Eldredge v. Taylor, 2014 OK 92, 339 P.3d 888, we upheld the right of the non-biological mother, and former partner in a same sex civil union to enforce the terms of a written co-parenting agreement. Eldredge was limited to its facts and was based on the enforcement of a written contract. Although in the instant matter, the couple did not enter into a written parenting agreement, marriage or civil union, the plaintiff asks to be recognized as a legal parent and seeks custody rights under Eldredge and Oklahoma's Uniform Child Custody Jurisdiction and Enforcement Act, 43 O.S. 2011, §§551-101 et seq. Since Eldredge was adopted, the Supreme Court of the United States ("SCOTUS") has ruled that marriage is a constitutionally guaranteed fundamental right for same sex couples in every state in this nation and affirming the longstanding constitutional right to have a family and raise children, Obergefell v. Hodges, 576 U.S. ____ (2015), 135 S.Ct. 2584, 192 L.Ed.2d 609. [1] Today we broaden Eldredge, acknowledging the rights of a non-biological parent in a same sex relationship who has acted in loco parentis [2] where the couple, prior to Bishop[3], or Obergefell, supra., (1) were unable to marry legally; (2) engaged in intentional family planning to have a child and to co-parent; and (3) the biological parent acquiesced and encouraged the same sex partner's parental role following the birth of the child.

¶3 In her petition in error, Ramey contends as a non-biological mother she has a legally protected interest giving her standing (1) as a parent under the provision "as otherwise provided by law" under the Oklahoma Uniform Parentage Act, ("OUPA") 10 O.S. 2011, §7700-101 - §7700-637; (2) as a third party recognized as a parent under Oklahoma common law estoppel principles; and (3) as a parent whose rights are constitutionally protected through the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. Because we hold that the long recognized equitable doctrine of in loco parentis provides Ramey standing to pursue a hearing on custody and visitation, we need not reach the other theories raised by Ramey.

¶4 Sutton admits to Ramey's involvement with their minor child from conception. However, she claims that Ramey has no legally protected interest in custody or visitation with their child for the reasons that (1) they never married or entered into a civil union even though such options were legally available in states outside of Oklahoma; and (2) they never entered into a written parenting agreement. Sutton makes no allegation that Ramey is an unfit parent. We find Sutton's argument unpersuasive.

I. STANDARD OF REVIEW

¶5 Motions to dismiss are not favored. Gens v. Casady School, 2008 OK 5 ¶8, 177 P.3d 565. The dismissal of a petition by the trial court is reviewed de novo. Eldredge, supra. at ¶3, Wilson v. State ex rel. State Election Bd., 2012 OK 2, ¶4, 270 P.3d 155, 157. As the reviewing appellate court, we must accept all allegations in Ramey's petition as true. Gens, supra.

II. FACTUAL BACKGROUND

¶6 Following Sutton's proposal of marriage to Ramey in 2004, the couple lived together in a committed relationship signified by a diamond ring for 8 ½ years. Early in their relationship, they decided to have a child and jointly parent, with Sutton as the biological mother. A friend of the couple agreed to be the donor. [4] Sutton was artificially inseminated, became pregnant and delivered their baby on March 22, 2005. Ramey attended all ultrasound appointments, shared in related pregnancy costs, and was present and participated in the delivery of their newborn. Sutton prepared a baby book for their child identifying both Sutton and Ramey as parents. Sutton gave a card to Ramey congratulating her on becoming a "mother" to their son and that she would be a wonderful mom.

¶7 Based on the couple's mutual decision, during the time of Sutton's pregnancy, she did not work and Ramey was the sole means of financial support. After their child's birth, Sutton remained home to care for their newborn and Ramey continued to support the family. Sutton did not return to work until the winter of 2005. Ramey sold her jeep to enable Sutton to continue to be a stay at home mother. Ramey also purchased a larger home to accommodate their expanding family.

¶8 During the first four years of their child's life, Ramey was the primary caregiver due to Sutton's work and sleep schedule. Ramey assisted in caring for their child following a tonsillectomy as well as providing other health care related needs. Their child has always referred to Ramey as "mom," but did not begin to refer to Sutton as "mom" until the age of five or six. Even today, their child will sometimes refer to Sutton, the biological mom as Kimberly and not as "mom." Ramey has always been and continues to be listed as "other parent" at her son's school. She was active in her child's school, serving as home room mother, volunteering for school activities including hosting class parties. Ramey has also built family traditions incorporating their child's love of the outdoors.

¶9 Throughout the time they were a couple, Ramey and Sutton lived together and held themselves out as a family to friends and relatives. They took multiple family vacations together. Ramey even claimed their child as a "dependent" on her tax return almost every year of the child's life. After their relationship ended, they continued to live together for another 1 ½ years as roommates while raising their child.

ARGUMENTS AND LEGAL ANALYSIS

¶10 On July 18, 2014, the United States Court of Appeals for the Tenth Circuit affirmed the Oklahoma federal district court's holding that Oklahoma's ban on same sex marriage was an unconstitutional burden on same sex couples' fundamental right to marry. Bishop, supra. After this decision, for the first time in Oklahoma, same sex couples in this state could enter into a legally recognized marriage. Almost a year later, on June 26, 2015, the United States Supreme Court determined that same sex couples in every state of this nation have a fundamental right to marry guaranteed by the Due Process and Equal Protection Clauses of the Fourteenth Amendment and further that marriages were entitled to full faith and credit between the states. Obergefell, supra. Following Obergefell, all state marriage laws that excluded same sex couples from civil marriage were invalidated.

¶11 One of the four principles central to the reasoning in Obergefell is that marriage "safeguards children and families and thus draws meaning from related rights of childrearing, procreation, and education". [5] The U.S. Supreme Court was also reminded of the constitutionally protected liberty interest in the right to marry, to establish a home and to raise children. [6] Central to its consideration is the harm caused to children of same sex couple families who are denied the constellation of benefits that States link to marriage. [7] Although the First Amendment insures that religious organizations may continue to advocate their views on same sex marriage, "[t]he Constitution does not permit the State to bar same-sex couples from marriage on the same terms as accorded to couples of the opposite sex." [8]

¶12 Prior to Bishop, supra., Oklahoma same sex couples could not enter into a legally recognized marriage in this state. Until Obergefell, supra., Oklahoma law denied full faith and credit to any marriage or civil union performed in another state. [9] Although Sutton extended a proposal of marriage to Ramey in 2004 and then wore a diamond ring to reflect their mutual commitment, it was legally impossible for this couple to wed in Oklahoma. Likewise, had the couple wed or entered into a civil union in another jurisdiction, it would have been a legal nullity in Oklahoma. [10]

¶13 The unfortunate demise of Sutton and Ramey's 8 ½ year relationship occurred more than two years before Bishop was decided and three years prior to Obergefell. By the time the federal district court and U.S. Supreme Court made their decisions, it was too late for this couple to take advantage of the legal protections of marriage. Oklahoma law deprived this couple from exercising their fundamental right and liberty to marry as guaranteed by our United States Constitution. The couple's failure to marry cannot now be used as a means to further deprive the nonbiological parent, who has acted in loco parentis, of a best interests of the child hearing.

¶14 We have consistently given compelling consideration to the best interests of the minor child in custody matters. Daniel v. Daniel, 2001 OK 117, 42 P.3d 863, Taylor, supra. Our long standing jurisprudence recognizes the fundamental right of a parent to the companionship, care, custody and management of the child as guaranteed by the United States Constitution and the Oklahoma Constitution. [11]

¶15 We have held that when persons assume the status and obligations of a parent without formal adoption they stand in loco parentis to the child and, as such, may be awarded custody even against the biological parent. [12] Other jurisdictions have relied on this doctrine in finding a former same sex partner had standing to bring a child custody action where the biological parent consented and encouraged her partner to assume the status of parent and acquiesced to the partner's performance of parental duties. [13] One court noted that although the biological mother enjoys many rights as a parent, it does not include the right to erase a relationship that she voluntarily created and fostered with their child. [14]

¶16 Ramey, the plaintiff, is not a mere "third party" like a nanny, friend, or relative, as suggested by the district court. On the contrary, Ramey has been intimately involved in the conception, birth and parenting of their child, at the request and invitation of Sutton. Ramey has stood in the most sacred role as parent to their child and always been referred to as "Mom" by their child. The community, school, medical providers and extended family have all known Ramey as the "other parent," all with the knowledge and mutual agreement of Sutton. The uncertainty facing Ramey, as reflected in this litigation, is the exact peril identified in Obergefell, supra., 135 S.Ct. at 2600, 2601.

¶17 At the time of the conception of their child, Ramey and Sutton, as competent adults, entered into an intentional intimate relationship and made a conscious decision to have a child and co-parent as a family. In this instance, Ramey does not seek custody in lieu of Sutton, the biological mother. Rather, she seeks to be recognized as a parent and to have a district judge consider these issues in a best interest of the child hearing. The couple, in a committed and long term relationship, collectively decided to have a family and then to raise the child together. Sutton now urges that Ramey should not even be allowed a best interest of the child hearing because they were never married, something that before Bishop would have been a legal nullity in Oklahoma. This couple and more importantly, their child, is entitled to the love, protection and support from the only parents the child has known. Sutton's argument must fail in light of the equities before this Court. Ramey is recognized as being in loco parentis to their child and is entitled to a best interests of the child hearing.

¶18 Insofar as Dubose v. North, 2014 OK CIV APP 68, 332 P.3d 311, is in conflict with this opinion, it is hereby overruled.

CONCLUSION

¶19 This case is intended to recognize those unmarried same sex couples who, prior to Bishop and Obergefell, entered into committed relationships, engaged in family planning with the intent to parent jointly and then shared in those responsibilities after the child was born. Public policy dictates that the district court consider the best interests of the child and extend standing to the nonbiological parent to pursue hearings on custody and visitation. This decision does not extend any additional rights to step-parents, grandparents, or others. Accordingly, we find the district court erred in granting the motion to dismiss, and that Ramey has standing to pursue a best interests of the child hearing.

DISTRICT COURT'S JUDGMENT REVERSED; 
REMANDED WITH INSTRUCTIONS.

REIF, C.J., COMBS, V.C.J., KAUGER, WATT, EDMONDSON, COLBERT, GURICH, JJ. - CONCUR

WINCHESTER, J., with whom TAYLOR, J. joins, CONCURRING IN RESULT:

"In child custody cases the Court must determine standing first based on an agreement of the parties. Then and only then is best interest considered to determine custody or visitation."

FOOTNOTES

[1] Obergefell relied on Zablocki v. Redhail, 434 U.S. 374, 384, 98 S.Ct. 673, 54 L.Ed.2d 618, quoting "[T]he right to 'marry, establish a home and bring up children' is a central part of the liberty protected by the Due Process Clause.", Obergefell, supra., 135 S.Ct. at 2600.

[2] See, Taylor v. Taylor, 182 Okla. 11, 75 P.2d 1132, 1938 OK 77, where we first recognized this doctrine; also see, Workman v. Workman, 1972 OK 74, ¶ 10, 498 P.2d 1384, adopting the definition of 'in loco parentis' as "one who has assumed the status and obligation of a parent without formal adoption."

[3] Bishop v. Smith, 760 F.3d 1070 (10th Cir.), cert. denied, 574 U.S. ____, 135 S.Ct. 271, 190 L.Ed.2d 139 (2014); see also footnote10, infra.

[4] The donor understood and agreed that Ramey and Sutton would co-parent and raise any child conceived as their own and that he did not have any obligations. The donor has never had a relationship with their son or provided any support. The donor has not asserted any claim for custody or visitation and is not a party to this action.

[5] Obergefell, supra., 135 S.Ct. at 2590.

[6] Obergefell, supra, 135 S.Ct. at 2600, citing Zablocki v. Redhail, 434 U.S. 374, 384, 98 S.Ct. 673, 54 L.Ed.2d 64 (1987).

[7] Obergefell, supra, 135 S.Ct. at 2601, noting that "[s]ame sex couples are consigned to an instability many opposite-sex couples would deem intolerable in their own lives."

[8] Obergefell, supra, 135 S.Ct. at 2607.

[9] See, footnote 10, infra.

[10] Okla. Const., Art. 2, §35, added by State Question No. 711, Legislative Referendum No. 334 and adopted in 2004, provides:

A. Marriage in this state shall consist only of the union of one man and one woman. Neither this Constitution nor any other provision of law shall be construed to require that marital status or the legal incidents thereof be conferred upon unmarried couples or groups.

B. A marriage between persons of the same gender performed in another state shall not be recognized as valid and binding in this state as of the date of the marriage.

C. Any person knowingly issuing a marriage license in violation of this section shall be guilty of a misdemeanor.

Bishop, supra, held Okla. Const., Art. 2, §35(A) to be unconstitutional; a result recognized by this Court in Eldridge, supra, 2014 OK 92, ¶14. However, the Bishop court declined to address the merits of the plaintiff's challenge to Okla. Const., Art. 2, §35(B). Bishop, supra, 760 F.3d at 1087-96. Accordingly, Okla. Const., Art. 2, §35(B) remained the law in Oklahoma until the decision of the United States Supreme Court in Obergefell, supra, where the Court determined "there is no lawful basis for a State to refuse to recognize a lawful same-sex marriage performed in another State on the ground of its same-sex character." 135 S.Ct. 2608.

[11] J.V. v. State, Dept. Of Institutions, Etc., 1977 OK 224, 572 P.2d 1283, ¶ 3; Alford v. Thomas, 1957 OK 218, 316 P.2d 188, ¶ 22.

[12] Taylor, supra., footnote 2.

[13]T.B. v. L.R.M., 567 Pa. 222, 786 A.2d 913 (2001); In re Scarlett Z.-D., 381 Ill. Dec. 729, 11 N.E. 3d 360 (2014).

[14] J.A.L. v. E.P.H., 453 Pa. Super 78, 682 A.2d 1314, 1322.






 Citationizer© Summary of Documents Citing This Document
 
 
 Cite
 Name
 Level
 
 
 None Found.
 
 
 Citationizer: Table of Authority
 
 
 Cite
 Name
 Level
 
 
 Oklahoma Court of Civil Appeals Cases
 Cite
Name
Level

 2014 OK CIV APP 68, 332 P.3d 311, DUBOSE v. NORTH
Discussed
Oklahoma Supreme Court Cases
 Cite
Name
Level

 1938 OK 77, 75 P.2d 1132, 182 Okla. 11, TAYLOR v. TAYLOR
Discussed at Length
 1957 OK 218, 316 P.2d 188, ALFORD v. THOMAS
Discussed
 2001 OK 117, 42 P.3d 863, 72 OBJ 3708, DANIEL v. DANIEL
Discussed
 1972 OK 74, 498 P.2d 1384, WORKMAN v. WORKMAN
Discussed
 2008 OK 5, 177 P.3d 565, GENS v. CASADY SCHOOL
Discussed
 2012 OK 2, 270 P.3d 155, WILSON v. STATE ex rel. STATE ELECTION BOARD
Discussed
 2014 OK 92, 339 P.3d 888, ELDREDGE v. TAYLOR
Discussed at Length
 1977 OK 224, 572 P.2d 1283, J.V. v. STATE, DEPT. OF INSTITUTIONS, ETC.
Discussed
Title 10. Children
 Cite
Name
Level

 10 O.S. 7700-101, Short Title
Cited
Title 43. Marriage
 Cite
Name
Level

 43 O.S. 551-101, Short Title
Cited